

FILED
JUN - 7 2011
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

In re

PRATT VINEYARDS, LLC,

        Debtor.

Case No. 10-35071-A-12

Docket Control No. SAC-5

Date: June 2, 2011
Time: 10:00 a.m.

**MEMORANDUM**

    The debtor moves to confirm its amended chapter 12 plan. Secured creditor ReProp Investments opposes that plan's confirmation, arguing that it is not feasible in light of the debtor's past financial performance. It also argues that the interest rate proposed for its secured claim remains "below the rate for similar type loans and provides no upward adjustment for the numerous risks associated with financing the debtor's loan."

    The court will confirm the amended plan and overrule the objections. Because the plan will be confirmed, it will deny ReProp's motion either to dismiss the case or grant it relief from the automatic stay.

I

    The court continued the confirmation hearing to May 24, asking the debtor to brief several issues, including whether the debtor would have the ability to refinance ReProp's loan at the end of the five-year plan term, and ReProp's objections concerning expenses the debtor had allegedly omitted from its financial projections. The debtor addressed these issues in

several documents filed to support confirmation of the plan.

At the request of the parties, the confirmation hearing was continued once again to June 2, 2011. In connection with the second continuance, the court gave no party leave to file anything further in support of, or in opposition to, confirmation of the amended plan. Nonetheless, on May 26 the debtor filed two additional declarations. The court will not consider these declarations.

The court disagrees with the debtor that ReProp's declarations filed on April 15 were similarly filed without leave of court. At the hearing on April 11, the court specifically authorized ReProp to a response to the evidence filed on April 6 by the debtor. See Docket 172.

II

Turning to the merits, the court concludes that the amended plan is feasible as required by 11 U.S.C. § 1225(a)(6).

First, with respect to the alleged understatement of taxes, as pointed out by the debtor, its revenue is generated mainly by nontaxable sales or services, including nontaxable grape sales, nontaxable wine client services, nontaxable out-of-state retail Internet wine sales, and nontaxable wholesale sales to bars and restaurants. The only taxable sales identified by the debtor are retail wine sales. Docket 195 at 5. This explanation satisfies the court. The debtor's financial projections do not materially understate this expense.

Second, with respect to the debtor's ability to refinance the property securing ReProp's claim, the debtor argues that

ReProp is undersecured. The debtor asserts that the property securing ReProp's claim has a value between $700,000 and $720,000. ReProp claims it is owed $719,250. Hence, the debtor's argument that ReProp is under-secured may or may not be the case.

Using the declaration of David Bolster, the debtor contends that the property securing ReProp's claim will appreciate "2%-5%" in value in the next five years, to "the low to upper $800,000's." However, appreciation in value from $700,000 to the low to upper $800,000's is not an appreciation of 2% to 5%. This appreciation exceeds 15% (an increase from $700,000 to $810,000 is 15.7%).

More important, while the declaration of David Bolster includes his October 2010 valuation of the property, that valuation is inconsistent with the debtor's claim that ReProp is undersecured. According to David Bolster's Broker's Price Opinion (BPO), the value of the property is $823,000, making ReProp an over-secured creditor, even without considering whether ReProp is secured by the debtor's personal property. See May 6, 2011 Bolster Decl.

The debtor also argues that ReProp should be estopped from claiming that it is oversecured because ReProp has repeatedly claimed that it is undersecured.

However, the debtor is the one who has the burden to establish plan feasibility, ability to refinance at the end of the proposed plan term, and the value of the property. This is not ReProp's burden of proof and thus, even if ReProp is estopped to claim that it is oversecured, that does not somehow establish

that ReProp is undersecured. In other words, regardless of what ReProp claims, the court must determine the value of the property based on the evidence presented by the debtor.

In this case, the evidence presented by the debtor, namely, the declaration of David Bolster incorporating the BPO from October 2010, supports the conclusion that ReProp is oversecured. According to its proof of claim, ReProp was owed $719,250 as of the petition date. David Bolster's BPO says that the property has a value of $823,000. And, although the BPO is dated October 2010, the court concludes that the value of the property was higher than $719,250 as of the June 8, 2010 petition date, just four months prior to the BPO date. The property did not appreciate in excess of $100,000 in the period of approximately four months, between the petition date and the BPO date.

Therefore, the court disagrees with the debtor that ReProp is undersecured. The court concludes that ReProp is oversecured and entitled to post-petition, pre-confirmation interest at the contract rate, 12.5%, for the eleven months that have passed since the petition date.

The interest on $719,250 is approximately $82,414. Thus, ReProp's claim as of May 2011 is $788,575 (($719,250 + $82,414) - three adequate protection payments totaling $13,089). Upon plan confirmation, the debtor will make a $90,000 payment, further reducing ReProp's claim to $698,575 ($788,575 - $90,000). Then, the debtor will make 59 payments of $5,180 to ReProp, further reducing the principal to approximately $592,418.64.

If the property does not appreciate beyond its current $823,000 value, the debtor would have approximately 28% equity in

the property (100 - ($592,418 / $823,000 x 100)). And, if the property appreciates to $900,000, as argued by the debtor, there would be approximately 34.2% equity in the property (100 - ($592,418 / $900,000 x 100)). The court has no evidence refuting David Bolster's opinion that the property is likely to appreciate 2% to 5% by the end of the five-year plan term.

An equity cushion of 28% to 34% will significantly increase the likelihood of a refinance of the property at the end of the five-year plan term. The court is satisfied that the debtor has a reasonable chance of obtaining a refinance and satisfying ReProp's claim in full.

Third, with respect to the expenses ReProp maintains were omitted from the debtor's financial projections, the court is satisfied that the debtor has explained their absence.

For the most part, the debtor has absorbed those expenses by having its principals, Mr. and Mrs. Pratt, perform work that is often outsourced by other wineries. See, e.g., May 6, 2011 David Pratt Decl. Also, the debtor's vineyard operation is relatively small, ten acres, allowing Mr. and Mrs. Pratt to do much of the work themselves. For instance, the maintenance and repair of equipment are minimal because Mr. Pratt does the work himself. Id. The same is true with the year-round care for the vineyard. Id. Except for the grape-picking, the Pratts do most of the work. This explains the low contract labor expense projected by the debtor.

It also explains the decrease in cost of goods sold and inventory. The debtor is producing its own wine inventory and its principals are doing most of the labor themselves.

1    The court further notes that the debtor's monthly $652
2 equipment lease with Bank of the West expires in September 2012.
3 This means that in 15 months the debtor's monthly expenses will
4 decrease by $652.
5    As to fees for licenses and permits, the debtor has based
6 its projections on a single $1,250 fee in 2010. This translates
7 into approximately $104 per month. Such fees are included in the
8 $166 per month allocated for accounting expenses. See May 6,
9 2011 David Pratt Decl.
10    As to the debtor's projected accounting expenses, they are
11 less than the debtor's accounting expenses in 2010 for two
12 reasons. In 2010, the expenses included accounting expenses
13 associated with the filing of the debtor's bankruptcy case. This
14 case was filed on June 8, 2010. Post-confirmation, however, the
15 debtor will not have such expenses. Also, during some of 2010,
16 the debtor's vineyard and winery businesses were two separate
17 entities, each with its own separate accounting records and tax
18 returns. See Docket 153, Ex. F. These two entities have been
19 consolidated thereby eliminating the duplicative accounting
20 expense.
21    The court concludes that the projected monthly accounting
22 expense of $62 ($166 total accounting expenses minus $104 for
23 licenses and permits) is sufficient to cover the debtor's likely
24 post-confirmation accounting expense.
25    As to promotion expenses, the debtor has stated that this
26 item includes "wine used for pouring at events, pouring in the
27 tasting room, and donations for fundraising." These expenses are
28 included in the projected $165 per month for miscellaneous

supplies. See May 6, 2011 David Pratt Decl. While the debtor spent more on promotion in 2010 than the projected $1,980 in annual promotion expenses ($165 x 12 months) under the plan, the court is not convinced that the debtor has underestimated or omitted these expenses. As noted earlier, the debtor is producing its own inventory of wine and is able to provide of its own wine at promotional events at a lower cost.

Fourth, the court rejects the argument that Mrs. Pratt's full time employment precludes her from devoting time in the operation of the winery and its tasting room. The Pratt's Schedules I and J from their chapter 13 bankruptcy case (Case No. 09-36899), indicates that Mrs. Pratt is an independent contractor earning $1,500 per month. Case No. 09-36899, Docket 1. The fact that she is an independent contractor and receives only $1,500 a month suggests that her employment other that in the debtor's winery and tasting room is part time.

Finally, the debtor has been in this bankruptcy proceeding for approximately 12 months and has shown that it is able to generate sufficient cash to make the payments called for under the proposed chapter 12 plan. The debtor has accumulated cash during the pre-confirmation period at a rate sufficient to fund the plan. See Docket 170, Ex. B.

The court is satisfied with the feasibility of the debtor's proposed plan.

III

The proposed 6.25% interest rate to be paid on ReProp's secured claim is sufficient to pay it the present value of its claim as required by 11 U.S.C. § 1225(a)(5)(B). Because ReProp's

1. claim will be paid over a 5-year period, this means that the plan
2. must provide that its claim will accrue interest at an
3. appropriate rate.
4.     Under <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465 (2004) the
5. appropriate interest rate is determined by the "formula
6. approach." This approach requires the court to take the national
7. prime rate in order to reflect the financial market's estimate of
8. the amount a commercial bank should charge a creditworthy
9. commercial borrower to compensate it for the loan's opportunity
10. costs, inflation, and a slight risk of default.
11.     The bankruptcy court is required to adjust this rate for a
12. greater risk of default posed by a bankruptcy debtor. This
13. upward adjustment depends on a variety of factors, including the
14. nature of the security, and the plan's feasibility and duration.
15. <u>Cf</u>. <u>Farm Credit Bank v. Fowler (In re Fowler)</u>, 903 F.2d 694, 697
16. (9th Cir. 1990); <u>In re Camino Real Landscape Main. Contrs., Inc.</u>,
17. 818 F.2d 1503 (9th Cir. 1987).
18.     To set the appropriate rate, the court is required to
19. conduct an 'objective inquiry' into the appropriate rate. The
20. debtor's bankruptcy statements and schedules may be culled for
21. the evidence to support the appropriate interest rate.
22.     "Moreover, starting from a concededly *low* estimate and
23. adjusting *upward* places the evidentiary burden squarely on the
24. creditors, who are likely to have readier access to any
25. information absent from the debtor's filing. . . ." <u>Till</u> at 479.
26.     The prime rate on the petition date, June 8, 2010, and on
27. the date of the confirmation hearing, was 3.25%. <u>See</u>
28. www.moneycafe.com/library/primerate.htm. As surveyed by the

Supreme Court in Till, courts using the formula approach typically have tended to adjust the prime rate 1% to 3% to account for credit risk peculiar to the specifics of a case.

The proposed rate of 6.25% is sufficient. The court so concludes for a variety of reasons. First, the proposed rate is well above the prime rate. Second, the court is convinced that the debtor will be able to perform its plan. Third, the objecting creditor's collateral is primarily real estate. There is no evidence before the court that its collateral has depreciated or is likely to depreciate during the five-year term of the plan. Fourth, at the end of five years, the debtor will likely be able to refinance the property and will pay ReProp's loan in full. Finally, the amended plan includes a significant lump sum payment, $90,000, further reducing the risk to ReProp and adequately protecting its interest in its collateral.

IV

For the foregoing reasons, the amended plan will be confirmed, the objections to confirmation will be overruled, and ReProp's motion to dismiss the case or for relief from the automatic stay will be denied. Counsel for the debtor shall lodge conforming orders.

Dated: 7 June 2011

By the Court

Michael S. McManus, Judge
United States Bankruptcy Court